| | |
|---|---|
| BENNIE GRAY, JR.,<br>    *Plaintiff,*<br><br>v.<br><br>OPEN HEARTH ASS'N, *et al.*,<br>    *Defendants.* | No. 3:17-cv-423 (JAM) |

# INITIAL REVIEW ORDER

Plaintiff Bennie Gray, Jr., is a prisoner at Enfield Correctional Institution in the custody of the Connecticut Department of Correction. He has filed a complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983 against defendants, a halfway house and its staff members as well as officers of the Connecticut Department of Correction. Plaintiff alleges defendants retaliated against him for filing grievances and lawsuits and deprived him of due process in violation of his constitutional rights. After an initial review, the Court concludes that the complaint should proceed on plaintiff's retaliation claim against four of the defendants and be dismissed as to the remaining defendants and claims.

## BACKGROUND

Plaintiff names nine defendants: Open Hearth Association, Fred Faulkner, Rasheba Williams, Scott Semple, Jason Bedard, Thomas Criscitiello, K. O'Brien, Anne Cournoyer and Counselor Santana. Doc. #1 at 1. The following allegations from plaintiff's complaint are accepted as true for purposes of this ruling.

In early 2016, plaintiff won a favorable settlement in a suit in state court that forced the

state to grant him earned credit toward his parole date and bring him to parole early. *Id.* at 13. The Hartford Parole and Community Service Division fought plaintiff's release to a halfway house in the region, but he appealed and ultimately was released on May 20, 2016, to a work release program at the Open Hearth halfway house. *Ibid.*

At Open Hearth, plaintiff's case manager was defendant Williams. Williams did not "see eye to eye" with plaintiff from the beginning. Plaintiff attended the intake meeting with his resume and a detailed plan for his stay at Open Hearth. Williams remarked that plaintiff "thinks he's all that." Doc. #1 at 2.

Plaintiff found a job at a restaurant within two weeks. He was fired from the job after one week because Williams refused to sign a weekend pass to enable him to go to work. Plaintiff spoke with Director Faulkner about his relationship with Williams. As a result of the meeting, plaintiff was not charged rent for the one week he was working at the restaurant. *Ibid.*

Plaintiff then sought permission to work at a barbershop. Williams said no. Plaintiff again appealed to defendant Faulkner who approved the employment. When Williams refused to sign plaintiff's pass and continued to speak disrespectfully to him, plaintiff filed a grievance against her. *Id.* at 3–4.

In response to the grievance, Williams went to plaintiff's place of employment. He was out eating lunch with his wife. When he returned to Open Hearth, he was called to account for his absence from work. Plaintiff admitted being out of place and accepted responsibility for his action. He was given "a 2 week restriction" and a parole officer put him on an ankle monitor, supposedly for only a couple weeks. Plaintiff was the only resident at Open Hearth to have an ankle monitor. *Id.* at 9–10. Plaintiff complained to the probation officer that Open Hearth was the

only halfway house in Hartford that did not permit family visits. The officer, who is not a defendant, stated he would speak with defendant Faulkner. *Id.* at 4.

Defendant Faulkner told plaintiff that "nobody writes grievances against the Open Hearth." He agreed to permit plaintiff to continue working at the barbershop if he would drop the grievance against Williams. Plaintiff continued working and enrolled full-time at Manchester Community College for the fall 2016 semester. *Ibid.*

When he was approaching completion of ninety days at the halfway house, plaintiff secured an apartment and gave the lease to Williams. On August 23, 2016, Williams told plaintiff that his Transitional Placement package had been forwarded to Parole for his release from the halfway house. Plaintiff asked to see the parole officer to have his ankle monitor removed. *Ibid.*

The parole officer told plaintiff that Williams had reported that plaintiff frequently returned late on his community passes. The officer showed plaintiff a pass that plaintiff had never left on, with a return time that had been altered. The officer also questioned plaintiff regarding his overtime work passes. Plaintiff tried to explain the Open Hearth overtime work policy. *Id.* at 5. In particular, Open Hearth had an overtime pass policy that allowed residents to work overtime if they called the front desk to let the staff know that they would be working late. But the permission would only be verbal, and the resident's later return would be recorded without any indication that they had permission to return late. *Ibid.* Plaintiff had nothing in writing to demonstrate this policy. The parole officer removed plaintiff from his job and ordered the ankle monitor continued for another month.

Dissatisfied with this result, plaintiff sought a team meeting with Open Hearth staff and

officials from Parole and Community Services. No parole officials came to the meeting and Faulkner rejected plaintiff's claims as lacking proof. Plaintiff filed a grievance regarding the overtime policy's lack of a written record. Plaintiff also filed a grievance about the lack of family visits. Following the failed meeting, plaintiff began recording all communications with staff and sought assistance from an outside agency. *Id.* at 5–6.

On September 12, 2016, plaintiff met with Faulkner who said that he was correcting flaws in the Resident Manual and would inform parole officials of his actions. Williams stated at the meeting that plaintiff was approved to return home on Transitional Placement and was just waiting for an officer from Parole and Community Services to check his apartment. Plaintiff's wife contacted Parole and Community Services to learn when they would do the check. She was told that plaintiff's Transitional Placement package had not been approved. *Id.* at 6.

Plaintiff confronted Faulkner who said to plaintiff "you want to be formal with us, we will be formal with you." *Id.* at 7. Faulkner said that if he found any reason to send plaintiff back to prison he would. Faulkner also stated that he was going to inform Parole Supervisor Bedard that he was not comfortable with plaintiff's release because plaintiff no longer had a job at the barbershop. Faulkner said that he would request a transcript of all locations plaintiff had been while on the ankle monitor and check the transcript against his records. *Ibid.*

During this time, two newspapers agreed to interview plaintiff. The articles, highlighting plaintiff's achievements since release, appeared on the front pages of the papers. *Ibid.* In one of them, plaintiff asserted that it was illegal for the state of Connecticut to give him the settlement they gave him but not give the same benefits to other prisoners. *Id.* at 13. In response, Open Hearth required that plaintiff be accompanied by two staff members whenever plaintiff addressed

anyone. *Id.* at 7.

Defendant Criscitiello was then assigned as parole officer for Open Hearth. He told plaintiff that he had no knowledge of his Transitional Placement package, but said that he would submit a package for plaintiff once plaintiff showed him two pay checks. Plaintiff did so. His ankle monitor was removed on October 27, 2016. On November 10, 2016, Williams signed off on the Transitional Placement package. She told plaintiff that, previously, she had prepared the wrong paperwork at the request of Parole and Community Supervision. *Id.* at 7–8.

On November 22, 2016, Criscitiello told plaintiff the package was being processed. From the night of November 25, 2016, to the morning of November 26, 2016, plaintiff was at his work assignment, but was reported as missing and accused of escape. Plaintiff encountered Open Hearth staff shortly after the report was made, and they informed him of the report. He refused to leave the lobby until the report was cleared up. After several hours, staff told plaintiff that his weekend passes were cancelled pending a team meeting with the director on Monday, November 28, 2016. Plaintiff never attended a meeting. Instead, on Monday Criscitiello handcuffed plaintiff and returned him to prison. *Id.* at 8–9.

Once in prison, plaintiff received a disciplinary report for the escape. *Id.* at 9. The disciplinary charge was later dismissed after a hearing when no supporting document were produced to support the charge. Defendant O'Brien falsified the delivery date of the disciplinary report from December 2, 2016, to December 1, 2016. *Id.* at 10–11.

After reviewing his master file, plaintiff asked defendant Santana for a copy of a memo from defendant Bedard indicating that plaintiff stated that there was no escape. Santana told plaintiff that Bedard and Ms. Theabault from Parole and Community Service agreed that plaintiff

5

would be immediately released if he dropped his grievance, did not pursue the copy and signed a medical release. *Id.* at 11–12. Although plaintiff signed the medical form, he was not released. Another counselor told plaintiff that he had been misled; she had no record of plaintiff's grievance and no paperwork for his release. Plaintiff was again approved for community release on February 3, 2017. *Id.* at 12.

Plaintiff sent a grievance to Santana on February 1, 2017, but has received no response. He also spoke with defendant Cournoyer and sent her a written request, but received no response. Plaintiff remains incarcerated.

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A(a), the Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. The Court must accept as true all factual matters alleged in a complaint, although a complaint may not survive unless its factual recitations state a claim to relief that is plausible on its face. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014). Nevertheless, it is well-established that "pro se complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of federal court complaints. A complaint must allege

6

enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g., Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g., Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

As an initial matter, although defendant Open Hearth Association is alleged to be a private company, Doc. #1 at 1, plaintiff has plausibly alleged state action on behalf of defendants Open Hearth and its staff. *See Braswell v. Community Solutions, Inc.*, 2013 WL 663621, at *4 (D. Conn. 2013) (concluding that a residential work-release program was an appropriate defendant in an action under 42 U.S.C. § 1983). Plaintiff's allegations describe frequent contact between Open Hearth's staff and the parole office, and defendant Open Hearth was engaged in the traditional "state function of incarcerating prisoners." *Ibid.* I therefore conclude that there "is a sufficiently close nexus" between the State and the actions of defendants Open Hearth, Faulkner, and Williams for plaintiff's action under § 1983 to be appropriate. *Tancredi v. Metro Life Ins. Co.*, 378 F.3d 220, 229 (2d Cir. 2004).

Plaintiff asserts two claims. The first claim combines language from Eighth- and Fourteenth Amendment- doctrine; plaintiff asserts that defendants were deliberately indifferent to his right to be treated the same as similarly situated individuals, "amounting to cruel and unusual punishment in violation of the 8th and 14th amendment[s]." Doc. #1 at 9. In the second claim, plaintiff contends that he was wrongfully imprisoned without due process of law. *Id.* at 10. I address these claims in turn.

## I.     *Eighth/Fourteenth Amendment*

Plaintiff's first claim combines the Eighth and Fourteenth Amendments. But plaintiff's claim fails to state any plausible Eighth Amendment claim. While plaintiff does allege a variety of unfair actions by defendants, those actions do not sound in the traditional realms of the Eighth Amendment, such as deliberate indifference to a substantial risk of physical harm, or "the denial of the minimal civilized measure of life's necessities." *See, e.g.*, *White v. Doe*, 2017 WL 2562845, at *3 (D. Conn. 2017). Plaintiff's allegations focus primarily on the unfairness of his confinement, not the cruelty of any punishment inflicted upon him. His conclusory invocation of the term "cruel and unusual punishment," Doc. #1 at 9, is not enough to state a claim under the Eighth Amendment.

Plaintiff's claim is more properly understood as a Fourteenth Amendment claim. The equal protection clause of the Fourteenth Amendment protects prisoners from invidious discrimination. This provision does not mandate identical treatment for each individual; rather it requires that similarly situated persons be treated the same. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439–40 (1985). Thus, plaintiff must allege facts showing that he was treated differently from similarly situated inmates and that the different treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000).

Plaintiff alleges that he was treated differently from all other inmates at the halfway house in that the Hartford Parole and Community Services Division required him to wear an ankle monitor, took his job, and refused to approve his Transitional Placement application. Doc.

#1 at 13. Plaintiff's allegations regarding similarly situated inmates are admittedly somewhat thin; the only specific comparison he makes is that he was the only resident of Open Hearth required to wear an ankle monitor. *Id.* at 9–10. But this, combined with plaintiff's statement that he was singled out by "a target on his back," *id.* at 13, and the special rules of solicitude for *pro se* litigants, is enough for a plausible inference that plaintiff was treated differently from other inmates. And throughout his complaint, plaintiff clearly alleges that the actions taken against him were done in retaliation for his successful state court lawsuit and for his filing of grievances. *See, e.g.*, *id.* at 10 (¶ 10); 13 (¶ 21); 14 (¶ 23). "[T]he filing of prison grievances and lawsuits is activity protected by the First Amendment." *Ziemba v. Lajoie*, 2016 WL 5395265, *6 (D. Conn. 2016). Plaintiff has therefore adequately alleged that he was singled out for punishment due to his exercise of a constitutionally protected right; I conclude that his complaint states a plausible equal protection claim.

Although plaintiff does not label his claim a First Amendment claim, the retaliation he describes could also plausibly state a claim for retaliation in violation of the First Amendment. *See Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (discussing the overlap between certain kinds of equal protection and First Amendment retaliation claims). Plaintiff has described adverse action, such as defendant Faulkner's threat not to permit plaintiff to continue working at the barbershop unless he dropped his grievance, that would be sufficient to deter an individual of ordinary firmness from exercising his constitutional rights. *See Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004). I therefore conclude that plaintiff has plausibly stated a claim for retaliation in violation of the First Amendment as well.

But plaintiff has not plausibly stated equal protection or First Amendment claims against all defendants. Plaintiff has alleged acts of retaliation by Williams and Faulkner, who threatened plaintiff with the loss of his job unless he dropped his grievance, Doc. #1 at 4, as well as Santana and Bedard, who threatened to withhold approval for community release unless he dropped his grievance. *Id.* at 11–12. Plaintiff has not alleged any retaliatory action by Criscitiello, O'Brien, or Cournoyer. Plaintiff's statement that defendant Semple is liable because the other defendants acted "under the authority of the Commissioner of Correction" is insufficient to state a claim against him, because "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. Similarly, plaintiff has not made any allegations of official policies or practices that would suggest Open Hearth itself is liable, as opposed to its employees. *See Braswell*, 2013 WL 663621, at *5 ("Private employers are not liable under [section] 1983 for the constitutional torts of their employees, unless the plaintiff proves that 'action pursuant to official . . . policy of some nature caused a constitutional tort.'"). Plaintiff's Fourteenth and First Amendment claims will therefore proceed against defendants Williams, Faulkner, Santana, and Bedard, and be dismissed as to all other defendants.

## II. *Wrongful Imprisonment*

Plaintiff's second claim is that he was wrongfully imprisoned without due process of law. As relief, plaintiff does not seek an order that he be released; he seeks only damages. The Supreme Court has held that, if a determination favorable to plaintiff in a section 1983 action "would necessarily imply the invalidity of his conviction or sentence," plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid before he can

recover damages under section 1983. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). This limitation has been extended to actions that challenge prison disciplinary proceedings that affect the fact or duration of confinement. *See, e.g.*, *Russ v. Haggan*, 2015 WL 928417, *2 (D. Conn. 2015). If plaintiff prevails on this claim, the Court would necessarily have determined that he was wrongly returned to prison. Thus, his continued confinement must be called into question by issuance of a writ of habeas corpus before this Court can entertain a claim for damages. The claim for wrongful imprisonment is therefore dismissed without prejudice as to all defendants. *See ibid.* (applying the *Heck* bar to a challenge to confinement regarding the propriety of a disciplinary charge for escape).

## Conclusion

In accordance with the foregoing analysis, the Court enters the following orders:

(1) All claims against defendants Open Hearth Association, Semple, Criscitiello, O'Brien, and Cournoyer and all due process claims against all defendants are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1). The case will proceed on the equal protection and First Amendment retaliation claims against defendants Bedard, Santana, Faulkner and Williams.

(2) **The Clerk shall** verify the current work addresses for defendants Bedard and Santana with the Department of Correction Office of Legal Affairs. The Clerk shall then mail waiver of service of process request packets containing the Complaint to defendants Bedard and Santana at the confirmed addresses and to defendants Faulkner and Williams at the address provided in the Complaint within **twenty-one (21) days** of this Order, and report to the court on the status of the waiver request on the thirty-fifth (35) day after mailing. If any defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S.

Marshal Service on him or her in individual capacity and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3) **The Clerk shall** send written notice to plaintiff of the status of this action, along with a copy of this Order.

(4) **The Clerk shall** send a courtesy copy of the Amended Complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(5) The defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent. If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claim recited above. They also may include any and all additional defenses permitted by the Federal Rules.

(6) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this order. Discovery requests need not be filed with the court.

(7) All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this order.

(8) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(9) If plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that plaintiff MUST notify the court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated.

Plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of address. Plaintiff should also notify the defendant or the attorney for the defendant of his new address.

  (10) Plaintiff shall utilize the Prisoner Efiling Program when filing documents with the court.

  It is so ordered.

  Dated at New Haven, Connecticut this 8th day of August, 2017.

                */s/ Jeffrey Alker Meyer*
                Jeffrey Alker Meyer
                United States District Judge